SMITH'S HEIRS v. HIRSCH et al.
(No. 225.)

(Court of Civil Appeals of Texas. Beaumont. July 12, 1917. Rehearing Denied Oct. 10, 1917.)

1. ACKNOWLEDGMENT ⬧⬦37(1) — BY MARRIED WOMAN—SUFFICIENCY.
    A deed executed by a married woman to her separate land did not pass title, where it does not appear from the acknowledgment that the deed was explained to her, and that she willingly signed it and declared that she did not wish to retract.

2. EVIDENCE ⬧⬦372(12)—ANCIENT DOCUMENTS —DEFECTIVE DEED.
    In a suit to cancel a deed given by a deceased mother after she became a widow, an original deed, 30 years old, to the same land, executed by the mother and her husband, was admissible as a receipt that the mother received the sum stated therein, although the acknowledgment to such deed was defective.

3. DEEDS ⬧⬦211(3)—FRAUD—SUFFICIENCY OF EVIDENCE.
    Before a deed can be canceled on the ground of fraud, facts and circumstances ought to be brought forth which would clearly lead a fair and reasonable mind to the conclusion that fraud was actually perpetrated.

4. DEEDS ⬧⬦211(2, 3) — FRAUD AND MUTUAL MISTAKE—SUFFICIENCY OF EVIDENCE.
    In a suit to cancel a deed, evidence *held* insufficient to show fraud or mutual mistake.

5. WITNESSES ⬧⬦140(7)—SURVIVING PARTIES —CONVERSATIONS.
    In a suit by the heirs of a grantor to cancel a deed, what the grantor said in conversation with reference to the execution of the deed could not be proved by the heirs, in view of Vernon's Sayles' Ann. Civ. St. 1914, § 3690, with reference to actions by heirs.

6. APPEAL AND ERROR ⬧⬦1056(6)—EXCLUSION OF TESTIMONY—HARMLESS ERROR.
    Where the testimony excluded would not, with the other evidence, have been sufficient to warrant the submission of the case to the jury, the exclusion of such testimony does not show prejudicial error.

7. TRIAL ⬧⬦68(3)—RE-OPENING CASE — DISCRETION.
    Where both parties, after having together introduced evidence for over a week, announced that they had concluded their testimony, and plaintiff's counsel stated in the presence of the court that he would not offer in evidence a certain deposition which had been in the files of the case for several years, and thereafter the law of the case was argued for two days, the court did not abuse its discretion in refusing to reopen the case for the introduction of the deposition, which could have been introduced in chief by plaintiff.

8. APPEAL AND ERROR ⬧⬦946—HARMLESS ERROR.
    The appellate court will not review causes on the ground that the trial court abused its discretion in some matter, unless it clearly appears that such discretion was abused to the prejudice of the complaining party.

Appeal from District Court, Harris County; Chas. E. Ashe, Judge.

Suit by Mary A. Smith against Jules Hirsch and others, in which the heirs of Mary Ann Smith were substituted as parties plaintiff. Judgment for defendants, and plaintiffs appeal. Affirmed.

⬧⬦For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

P. K. Ewing, of Houston, Willett Wilson, of Port Lavaca, and D. F. Rowe, of Houston, for appellants. Wilson, Dabney & King, T. J. Lawhon, Baker, Botts, Parker & Garwood, Andrews, Streetman, Burns & Logue, J. W. Lockett, L. A. Carlton, R. H. Holland, Maurice Hirsch, Geo. A. Hill, Jr., W. H. Wilson, and S. H. Brashear, all of Houston, for appellees.

HIGHTOWER, C. J. Mary Ann Smith, on the 15th day of April, 1875, owned in her separate right, and in the John Brown Jones one-third league survey in Harris county, Tex., which may be described as follows: (1) 200 acres known as the "Dunman Homestead," and (2) approximately an undivided one-tenth interest in the remaining part of two tracts of 492 and 279½ acres, after deducting therefrom said 200 acres.

Mary Ann Smith, at the date above mentioned, was a married woman, the wife of Nathan W. Smith, and, joined by her husband, on said 15th day of April, 1875, said Mary Ann Smith made and executed to Pleasant S. Humble, of Harris county, Tex., for the recited consideration of $500, the following deed:

"The State of Texas.

"Know all men by these presents, that we, Nathan W. Smith and Mary Ann Smith, of the county of Harris in the state of Texas, in consideration of the sum of five hundred ($500) dollars to us paid by Pleasant S. Humble, of the county of Harris in the state of Texas, have granted, bargained, sold, and released, and by these presents do grant, bargain, sell and release, unto the said Pleasant S. Humble the following piece or parcel of land, including improvements, described as follows:

"Being the homestead of Mrs. Nancy Dunman, including two hundred (200) acres of the headright of J. B. Jones, the same being situated in Harris county, Texas, bordering on the San Jacinto river, and adjoining the survey known as the W. B. Adams headright, and adjacent land to be the same as the county records show to have been transferred from the adjacent Nancy Dunman unto Elizabeth J. Hogan. Also all our interest and claim in or on the above-described property and land, included in the homestead and J. B. Jones survey.

"To have and to hold the above-granted premises to him, the said Pleasant S. Humble, forever, together with all and singular the rights, members, hereditaments, and appurtenances to the same belonging or anywise incident or appertaining. To have and to hold all and singular the premises above-mentioned unto the said Pleasant S. Humble to him, his heirs and assigns, forever; and we do hereby bind ourselves, heirs, executors, and administrators to quitclaim all and singular the said premises unto P. S. Humble, his heirs and assigns, against every person whomsoever lawfully claiming, or to claim, the same or any part thereof.

"In testimony whereof, we, Nathan W. Smith and Mary Ann Smith, have hereunto set our hands and seal, using scroll for seal, this the 1st day of January, A. D. 1875.
"Nathan W. Smith [Seal.]
"Mary Ann Smith [Seal.]"

This deed bears the following acknowledgment:

"State of Texas, Harris County.

"Before me, James Harrington, a justice of peace of the county of Harris in the state of Texas, duly commissioned and qualified, this day came and personally appeared Nathan W. Smith and wife, Mary Ann Smith, of the county aforesaid, to me personally known, who in my presence signed the above deed, and the said Mary Ann Smith, wife as aforesaid, having been examined by me and apart from her said husband, acknowledged the execution of the foregoing deed, dated the 15th day of April, A. D. 1875, and delivered the same as their binding act and deed, for the purposes and considerations herein set forth and contained.

"Given under my hand and seal at my office this 15th day of April, A. D. one thousand eight hundred and seventy-five.

"James Harrington,
"J. P., N. P., H. C. [Seal.]"

This deed shows to have been filed for record in Harris county, Tex., May 14, 1875.

Mary Ann Smith, on May 30, 1901 (she being then a widow), made, executed, and delivered to Sidney Westheimer, for a recited consideration of $5, the following deed:

"State of Texas, County of Galveston.

"Know all men by these presents, that I, Mary Ann Smith, a widow, of Chambers county, being an heir of Elizabeth Hogan, who was an heir of Joseph and Nancy Dunman, for and in consideration of $5, to me in hand paid by Sidney Westheimer, the receipt whereof is hereby acknowledged, have granted, bargained, sold, and conveyed and by these presents do grant, bargain, sell, and convey unto the said Sidney Westheimer, all my right, title, interest, and claim in and to all that part of the John Brown Jones original survey (which survey lies on San Jacinto river in Harris county, Texas), which was formerly owned by Jos. Dunman and Nancy Dunman, his wife, or by my mother, Elizabeth Hogan. To have and to hold said interest in said land unto said Sidney Westheimer, his heirs and assigns forever.

"Witness my hand at Galveston, this the 30th day of May, A. D. 1901.
"[Signed]             Mary Ann Smith."

This deed bears the acknowledgment of Mary Ann Smith, which is in the usual and regular form for a single woman, and which is certified by Thos. L. Cross, a notary public of Galveston county, Tex., on May 30, 1901.

This suit, as originally filed, was an action of trespass to try title simply, and was brought by Mary Ann Smith, as sole plaintiff, on December 7, 1904, against Jules Hirsch, Sidney Westheimer, and others unnecessary to name, to recover from said defendants the title and possession of the land described in the above deeds. The action remained one of trespass to try title until the filing of plaintiffs' third amended original petition, by which, for the first time, the plaintiff, Mary Ann Smith, also sought to cancel and set aside the deed from herself to Westheimer, above described, on the alleged ground that said deed was obtained by fraud practiced upon her by Westheimer. Afterwards, plaintiff, Mary Ann Smith, filed her fourth amended original petition, by which, in addition to the allegations of trespass to try title and the allegation that said deed to Westheimer was obtained by fraud, she also sought to cancel and annul said deed to Westheimer on the ground of mutual mistake in its execution. A fifth amended original petition was filed by the plaintiff, Mary Ann

Smith, containing substantially, the same allegations and prayer contained in her fourth amended petition.

Mary Ann Smith, on January 5, 1915, died, and on September 22, 1915, by the sixth amended original petition, Arthur Smith, Harry Smith, S. J. Smith, Thomas Smith, Elizabeth Keller, and her husband, A. F. Keller, Sadie Nelson, a feme sole, Della George, and her husband, E. M. George, Lilla Stephenson, and her husband, Lex Stephenson, and Lula Pettit, and her husband, R. N. Pettit, the sole surviving heirs of said Mary Ann Smith, made themselves parties plaintiff, in the stead of Mary Ann Smith, and were permitted to continue the prosecution of this suit as the heirs of Mary Ann Smith.

The sixth amended original petition, which is quite lengthy, in addition to the action of trespass to try title, also alleges that the deed from Mary Ann Smith to Westheimer, above described, was procured by fraud perpetrated upon Mary Ann Smith by said Westheimer, or, if not so procured by fraud, that then the same was the result of a mutual mistake, and that, in either event, it ought to be held by the court that said Westheimer was simply a trustee of the legal title of said land for the benefit of said Mary Ann Smith, with the equitable title in her. Plaintiffs further alleged that the defendants, other than the defendant Westheimer, claimed through him under said deed, and were not innocent purchasers, but, if held to be so, plaintiffs had the right to recover from their vendors, in each instance, the value of the land at the time of trial, or the price for which sold, with lawful interest, as should be to the advantage of the plaintiffs, and as they might elect. There were other averments in the petition, which it is unnecessary here to mention. All of the defendants duly answered by general denial, plea of not guilty, pleas of innocent purchaser, and pleas of limitation.

After conclusion of the evidence, the trial court peremptorily instructed a verdict in favor of all defendants, and judgment was entered in favor of the defendants upon such verdict, and plaintiffs were allowed to take nothing by the suit. To this action on the part of the court plaintiffs duly excepted, and the case has been properly brought here for review.

Appellants' first assignment of error is as follows:

"The court erred in peremptorily instructing the jury to return a verdict in favor of defendants, over the objection and exception of the plaintiffs, duly taken and preserved, because the defendants were not entitled to a verdict as matter of law, but, on the contrary, the evidence was amply sufficient to warrant a finding by the jury under the issues entitling plaintiffs to recover against the defendants, or some of them, as shown by plaintiffs' bill of exceptions No. 11."

The first proposition under this assignment is:

"The evidence reasonably warranted the jury in inferring, in connection with the other requisite facts, that the quitclaim deed from Mary A. Smith to Westheimer was obtained under circumstances of fraud, or, if not, of mistake, as alleged, entitling plaintiffs to relief."

There are other propositions under the assignment, by which it is contended that defendants were not entitled to recover as innocent purchasers, or under any of the statutes of limitation.

The main question, the determination of which is controlling, as we think, is whether the evidence adduced on the trial below was sufficient to warrant a finding by the jury that the deed executed by Mary Ann Smith to Westheimer on October 30, 1901, above set out, was obtained by fraud perpetrated upon her by Westheimer, or whether the evidence adduced was sufficient to warrant a finding by the jury that such deed was the result of a mutual mistake, as claimed by appellants.

[1] We might, at the outset, say that the deed executed by Mary Ann Smith and her husband, Nathan W. Smith, in 1875, did not have the effect to pass the title to the property in controversy from Mary Ann Smith to Pleasant S. Humble, for the reason that the acknowledgment of Mary Ann Smith, as certified by the officer taking same, was defective and invalid and insufficient to pass the title of a married woman to land which was her separate property, because it does not appear from the acknowledgment that said deed was explained to Mary Ann Smith, and because it does not appear that she willingly signed said deed, and also it does not appear that she declared that she did not wish to retract said deed. This proposition of law is so well settled in this state that the citation of authorities to sustain it would be superfluous. Therefore the title to the property in controversy remained in Mary Ann Smith until her death, and at her death vested in appellants, unless Mary Ann Smith's deed to Westheimer of October 30, 1901, divested the title of the property in controversy out of Mary Ann Smith, which we hold it did, unless it was shown by the evidence in this case that said deed to Westheimer was obtained by fraud, or was the result of a mutual mistake, as claimed by appellants. The evidence on this point may be substantially stated as follows:

Sidney Westheimer, who is one of the appellees, was a purchaser of the larger portion of the land in controversy under the claimed Humble title, and prior to October 30, 1901, Westheimer, claiming under the Humble title, had made a number of separate conveyances of different portions of the land in controversy to a number of different persons, sometimes by general warranty deed, and sometimes by special warranty deed, and sometimes by mere quitclaim deed; and he or his attorneys had discovered, prior to October 30, 1901, the defect or invalidity of the acknowledgment of Mary Ann Smith to her deed to Pleasant S. Humble in 1875, and being desirous of curing his title to the land

claimed by him and his vendees under the Humble title, and acting upon the advice of counsel, Sidney Westheimer, on October 30, 1901, went to Smith's Point, in Galveston county, to see Mary Ann Smith, and procure from her, if he could, a quitclaim deed to her interest in the land, which she had attempted to convey to Pleasant S. Humble on the 15th day of April, 1875. Westheimer carried with him at the time the quitclaim deed, which is above set out, which had been prepared for execution by Mary Ann Smith; and on the same day Westheimer found Mary Ann Smith at her home at Smith's Point, in Galveston county, which point is across the bay from Galveston, and about 21 miles distant therefrom. After reaching the home of Mrs. Smith on that day, the evidence shows that Westheimer remained there and conversed with Mrs. Smith for a period of approximately two hours, after which time Mrs. Smith and Westheimer left the home of Mrs. Smith and went across the bay to the city of Galveston in a boat which belonged to Mrs. Smith's son, Arthur Smith, a young man about 19 years of age at that time; and, upon reaching Galveston, Mrs. Smith and Westheimer went before a notary public, Thomas L. Cross, and there Mrs. Smith signed and acknowledged the quitclaim deed to Westheimer, as originally prepared for execution by her, with the exception that the name of the county was changed from Chambers to Galveston, and the name of the grantee from Pleasant S. Humble to Sidney Westheimer. This change, as the evidence shows, is in the handwriting of the notary public himself, but the evidence does not disclose at whose suggestion this change was made. Mrs. Smith's reason for not executing this deed at her home in Chambers county was because there was no officer there authorized to take her acknowledgment thereto, and, in order to acknowledge the deed at that time, she would have to have gone either to the county site of Chambers county or to the city of Galveston to find an officer authorized by law to take her acknowledgment. The evidence also shows, without dispute, that at the time of her execution of this deed Mrs. Smith was in very poor health, and was weak and nervous; that she was greatly disturbed on account of the effects upon her of the devastating storm which occurred in September, 1900, which caused the destruction of nearly all the property and effects owned by and belonging to her; that she was much grieved over the death of a daughter, who had died from the effects of said storm and not a great while before the execution of this deed, and also that her husband, Nathan W. Smith, had died not a great while (a year or so, perhaps) prior to the storm. It was further shown that Mrs. Smith, at the time of the execution of this deed, was possessed of very little property, and, in fact, had very little means of support and sustenance. It was

further shown that her life at Smith's Point, especially since the death of her husband and daughter, was very lonely, and that the only other members of the family were her said son, Arthur, and a young daughter, who was at that time about 15 years of age. It was further shown by the evidence that two or three days prior to Westheimer's arrival Mrs. Smith had lost her eyeglasses, and that she did not have them on the day that Westheimer came, and that her sight was very poor, and that it was only with great difficulty that she was able to read without her glasses. In addition to the showing that Mrs. Smith's health was very poor, and that she was generally nervous and easily excited, owing to the effect upon her of the deaths in her family and the destruction wrought by the storm, it was also shown that she had become of a very timid disposition and shrank from company, and that, in fact, as claimed by her daughter, Mrs. Keller, she was at that time, and had been for some time prior, "somewhat mentally affected." It was shown, further, that Mrs. Smith had no familiarity with business affairs; knew very little about law; had no familiarity with courthouse proceedings; had never engaged in the land business of buying and selling lands; and that none of Mrs. Smith's children had any knowledge of the business of buying and selling lands. It was further shown that at the date of the execution of this deed Mrs. Smith was about 61 years old; that she had all her life lived in the country and knew very little about city life and habits; that she possessed very little education, etc. It was also shown that at the date of the execution of this deed there were no lawyers nearer Smith's Point, where Mrs. Smith lived, than the county site of Chambers county, which was then Wallisville, and that, therefore, Mrs. Smith had no opportunity to seek legal advice at her home at the time Westheimer came for the deed in question.

On the other hand, it was shown that Westheimer was a man of business affairs and training, and was fresh from the city of Houston, and it is therefore contended by appellants that Mrs. Smith did not meet Westheimer upon equal terms, etc.

It was proved also by Mrs. Elizabeth Keller, a daughter of Mrs. Smith, that she (Mrs. Keller) heard a conversation, in the summer of 1904, between her mother and D. F. Rowe, one of the attorneys for Mrs. Smith, at Humble, Tex., in which conversation Mrs. Keller stated that Mr. Rowe then told her mother that she still owned the land in controversy; that her title had not passed by the deed her mother made to P. S. Humble; and that she owned the land at the time she made the quitclaim deed to Westheimer; and that when Mr. Rowe made the statements to her mother, she (Mrs. Smith) appeared very much excited. The same facts, substantially, were testified to by the attorney, Mr. Rowe. The

same facts, substantially, were also testified to by the husband of Mrs. Keller. This testimony on the part of Mrs. Keller and her husband, A. F. Keller, and Attorney D. F. Rowe, was objected to by appellees for a number of reasons; but the objections were overruled, and this testimony was admitted by the trial court.

The deposition of Thos. L. Cross, a notary public of Galveston, before whom the deed from Mrs. Smith to Westheimer, which is here sought to be canceled and annulled, was acknowledged, was taken, and the witness testified, among other things, that he remembered the occasion of Mrs. Mary Ann Smith's and Sidney Westheimer's coming before him in his office in Galveston for the purpose on the part of Mrs. Smith of acknowledging said deed, and that she did, in fact, acknowledge the deed, as shown by his certificate thereto, and that Mrs. Smith did, in fact, sign the deed there in his presence. The witness thought that he did not read the deed to Mrs. Smith, nor did he explain the same to her, for the reason that, she being a single woman, he was not required to explain the deed to her. Witness further testified that he did not see any consideration paid Mrs. Smith for the deed, and had no recollection of any consideration for the deed being mentioned in his presence; that witness had never seen Mrs. Smith prior to said date, but had seen Westheimer, and knew him by sight, but never knew his name, and had had no personal acquaintance with him; that Mrs. Smith was introduced to him by Westheimer on the occasion in question. The witness further testified that on the occasion in question he observed nothing unusual or unnatural about the appearance of Mrs. Smith, and stated that to him she seemed to be a woman of ordinary intelligence and to be sensible and sane.

Appellants also introduced, as a witness on the trial below, Judge Sam H. Brashear, who testified, substantially, among other things, that he had been a practicing lawyer in Houston since the year 1887, except four years, when he was district judge, and that he was familiar with the examination of land titles; that witness was interested in two certain tracts of the land in controversy, being the Butler and Isaacks tracts; and that he had examined the title prior to the time the deed from Mrs. Smith to Westheimer was obtained; and that he understood that, under Westheimer's warranty deed to him and associates of the Butler tract, the deed from Mrs. Smith to Westheimer would inure to his benefit automatically, if obtained by Westheimer. Witness further testified that he was not Westheimer's attorney at the time of the preparation of the deed in question, but that he, in fact, prepared the deed for execution by Mrs. Smith, and thinks that he told Westheimer it would be advisable to get the deed from Mrs. Smith, and that he, perhaps, was the first to suggest that said deed be pro-

cured, and that he prepared the same. He further testified that, when he advised Westheimer to get the deed from Mrs. Smith, he had discovered the defects in Mrs. Smith's acknowledgment to the deed from herself and husband to Pleasant S. Humble, executed in April, 1875, and witness understood then as well as at the time of trial, that the certificate to the Humble deed was invalid on its face, etc.; that Westheimer may have inquired of him why it was advisable to get the quitclaim deed, but that he did not remember about that; but that he supposed that if Westheimer had asked him as to why it was advisable to get the deed he would have told Westheimer what he regarded the defects to be, and the effect of such, and knew of no reason why he would not have done so.

It might be stated here that Westheimer, prior to obtaining the deed here sought to be canceled by appellants, claiming title to a large portion of the land in controversy under the Humble title, had conveyed portions thereof to said Brashear and others, by general warranty deed, and that Westheimer still retained a large portion of the land in controversy, his only title and claim thereto, prior to the so-called quitclaim deed, was through and under the Humble title; so that it will be seen that at the time Westheimer procured the so-called quitclaim deed from Mary Ann Smith, in October, 1901, he was not only interested in procuring same because of his warranty to Brashear and others, but was also interested because at that time he still retained and claimed a large portion of the land in controversy under said deed to Humble.

We believe that the above statement shows, substantially, every material fact and circumstance which was offered in evidence by appellants, and was admitted by the trial court as bearing upon the contention of fraud or mistake in the procurement and execution of the deed from Mary Ann Smith to Sidney Westheimer, which appellants seek to cancel by this suit; and we shall now proceed to discuss briefly the question as to whether these facts and circumstances, taken and considered in connection with other facts and circumstances shown by the record, were sufficient to have warranted a finding by the jury that the said deed from Mary Ann Smith to Sidney Westheimer of date October 30, 1901, was, in fact, procured by fraud, or was the result of mutual mistake, or any other character of mistake.

[2] The original deed itself, from Mary Ann Smith and her husband, Nathan W. Smith, executed in 1875, was in evidence on the trial below, having been produced by appellee, Sam H. Brashear, who testified that he had, a long time prior thereto, obtained the same from P. S. Humble, and, in short, it was shown that that old deed came from proper source, and was free from suspicion, and at the time of its admission in evidence

was more than 30 years of age, and therefore the same was an ancient instrument; and while the same had not the effect to pass any portion of the title to the land in controversy out of Mary Ann Smith, we think, nevertheless, that this old deed, containing the recitation that Pleasant S. Humble paid therefor to the grantors therein the sum of $500 in cash, was admissible as a receipt executed by Mary Ann Smith to the effect that she had, in fact, received this $500 as recited in said deed. Holt v. Maverick, 5 Tex. Civ. App. 650, 23 S. W. 751; Ballard v. Carmichael, 83 Tex. 360, 18 S. W. 734; Shinn v. Hicks, 68 Tex. 279, 4 S. W. 486; Rigsby v. Galceron, 15 Tex. Civ. App. 377, 39 S. W. 650.

This record discloses, without dispute, that after the execution of the deed from Mary Ann Smith and her husband, Nathan W. Smith, to Pleasant S. Humble, in April, 1875, neither she nor her husband, nor any one else for her, ever in any manner made any claim to any portion of the land in controversy in this suit until the filing of the original petition in this case on the 7th day of December, 1904; that no portion of the land was ever assessed for taxes by said Mary Ann Smith, either by herself or husband, or any one else for her, nor were any taxes on said land ever paid by her, or any one for her, subsequent to the date of said deed, but, on the contrary, ever since the execution of said deed to Humble, the land in controversy has been regularly assessed for taxes, and the taxes accruing thereon have been regularly paid by the said Pleasant S. Humble and his vendees, holding portions of the same by purchase from Humble, and during all the years from 1875 to the present time active claim has been made to the land in controversy by Humble and his vendees, and portions of the land have been in actual, notorious, and exclusive possession of said Humble and his vendees and others holding under the said old deed, much of the land being regularly cultivated and the timber thereon cut and removed under claim of title under said deed, and many deeds have been placed of record in Harris county by persons deraigning and claiming title under said old deed. During all of this period of time, since 1875, Mrs. Mary Ann Smith, and her husband, prior to his death, in December, 1889, lived, it may be said, near the land in controversy, but, as stated above, no character of claim by them or either of them was made thereto, nor was any objection whatever ever made by them or either of them to the acts of ownership exercised by Humble and his vendees and others holding under the Humble title, but such claim of ownership on the part of Humble and all persons holding under and through the deed made to him in 1875 seem to have been fully acquiesced in by Mary Ann Smith until the filing of this suit. It does appear from the record, however, that on October 30, 1899, the said Mary Ann Smith executed to D. F. Rowe, as her attorney in fact, a power of attorney, which was filed for record December 7, 1904, being the same date that this suit was filed. This power of attorney reads in part as follows:

"Know all men by these presents, that I, M. A. Smith, of the state of Texas and county of Galveston, have made, constituted, and appointed D. F. Rowe, of Harris county, Texas, my true and lawful attorney in fact for me and in my name, place, and stead, to ask, collect, demand, and receive for all claims or demands due me from any source whatever, sue for and recover for me all lands in the state of Texas to which I am entitled, either by inheritance or by purchase or otherwise, hereby giving my said attorney full power to make, execute, and deliver deeds of conveyance or other instruments for such prices and upon such terms as my said attorney shall deem best, and to do and perform any and all acts necessary to be done in and about business as fully as I could do if I were personally present, with full power of substitution, hereby ratifying and confirming all that my said attorney or his substitute shall do by virtue hereof, it being understood and agreed that this contract does not embrace any land in the state of Texas upon which I pay taxes. And whereas, the said D. F. Rowe has now and will further incur considerable expense in the prosecution of the recovery of said lands: Now, therefore, I, M. A. Smith, in consideration of the services performed and to be performed by D. F. Rowe, and in consideration of the further sum of one dollar to me in hand paid, do hereby grant, bargain, and sell, release, convey, and confirm unto the said D. F. Rowe, of Harris county, Texas, an undivided one-half interest in and to all the lands to which I may be entitled in the said state of Texas, and an undivided one-half interest in and to all claims or other valuables recovered under the terms of this contract. To have and to hold unto the said D. F. Rowe, heirs and assigns, forever, free from all claims or demands by, through, or under me."

Acting under this power of attorney, the said D. F. Rowe, as attorney for Mary A. Smith, filed this suit. We would further state in this connection that the said D. F. Rowe testified on the trial that at the time of the execution of this power of attorney by Mrs. Smith the land in controversy in this suit was not in the mind of either party thereto, but had reference especially to lands in Liberty county.

Now, should the facts and circumstances mentioned above, taken as a whole, be considered sufficient evidence, bearing on appellants' claim of fraud or mistake in the execution of the Westheimer deed, to have carried this case to the jury for a finding and determination of these issues? After very careful consideration of appellants' contention on this point, asd after carefully analyzing this evidence, and after reading most, if not all, of the authorities cited in support of this contention, we have reached the conclusion that said facts and circumstances, considered in the most favorable light to appellants, were not sufficient to have warranted a finding by the jury that said deed to Westheimer was either procured by fraud, or was the result of a mutual mistake, or any other kind of mistake, as claimed by appellants. We could not afford to follow counsel so far

afield as to discuss the many deductions that counsel would make from this evidence in favor of their contention, but we think we are justified in saying that their reasons and argument on this point may be substantially and briefly stated as follows:

It is argued, in the first place, that the evidence is practically conclusive to the effect that no consideration was paid Mary Ann Smith for the land in controversy, title to which was in her at the time of the execution of the deed to Westheimer; that the recited consideration of $5 was so grossly inadequate that the same amounts to no consideration at all; that, owing to the fact that Mrs. Smith was practically in poverty at the time of the execution of this deed, the jury would have been warranted in finding that she did not execute the deed and give away this valuable property (and it might be added here that the record shows that, at the time of the execution of the Westheimer deed, the property in controversy was worth, perhaps, from $20 to $25 an acre) with the knowledge that the same belonged to her, and that, therefore, the jury might have reasonably inferred that some fraud was perpetrated upon her by Westheimer, which induced her to execute this deed, or, if not, that Westheimer himself, at the time labored under a mistake as to the title to same being in Mrs. Smith, and that he (Westheimer) made representations to her which induced the mistaken belief on her part that title was not in her, and that, therefore, the jury would have been warranted in finding that the deed was executed by mistake, as claimed by appellants; the evidence showing that Mrs. Smith was unfamiliar with business transactions of this character, and possessed very little education, and was without advice from any one as to her rights touching the land; the evidence showing that, at the time of the execution of this deed, Mrs. Smith was nervous and weak, and almost distracted from grief on account of the death and loss of her husband and daughter recently before, as well as the ravages wrought by the storm of 1900; the fact that it was necessary, as claimed by appellants, for Westheimer to remain at the home of Mrs. Smith so long before he finally succeeded in getting her consent to execute said deed; the fact that she had no glasses at the time, and was probably unable to read said deed before executing same; the fact, as claimed by appellants, that Westheimer probably told Mrs. Smith that the defect in her acknowledgment to her deed of 1875 was merely a defect that he would be authorized to cure by legal proceedings, and that she would be put to the cost and trouble of such proceeding to cure said deed, and other similar argument and reasons advanced by appellants' counsel, were all, when considered together, sufficient to have reasonably warranted the jury in finding the issues of fraud and mistake touching such Westheimer deed, as claimed by appellants.

If appellants be correct in their contention that the evidence in this case shows that there was no consideration moving Mrs. Smith to execute the Westheimer deed, other than the $5 recited in said deed, then it might be admitted that, in contemplation of law, no consideration was paid Mrs. Smith for the property in controversy, and that, therefore, the want of any consideration might be a circumstance tending to show fraud or mistake in the execution of the Westheimer deed. But we cannot agree with the contention of able counsel for appellants that the evidence in this record shows that no consideration, unless it be the $5 recited in this deed, was paid Mary Ann Smith for the land in controversy, but, on the contrary, we have concluded that the facts and circumstances in this record overwhelmingly justify the presumption that Mrs. Smith, in executing the deed to Westheimer, remembered and appreciated the undisputed fact that in April, 1875, she sold this land to Pleasant S. Humble, and that she received a cash consideration of $500 therefor, which was very probably the value thereof at that time, and that such money so received by her was, in fact, the consideration for the execution of the deed to Westheimer, claiming title under the deed to Humble. We think that it would not be unreasonable to presume, from the facts as disclosed by this record, that Mrs. Smith, on the date of the execution of her deed to Westheimer, fully remembered the execution of her deed to Humble in 1875, and the receipt of the $500 paid by Humble for the land at that time attempted to be conveyed by her, and we cannot agree with learned counsel that there was no moral obligation whatever resting upon Mrs. Smith to execute the deed to Westheimer, in view of a knowledge on her part of the fact that she had theretofore attempted to fully convey the title to the land in controversy to Humble, but had failed in the attempt, but had received, however, full consideration for the land so attempted to be conveyed.

It is argued, in effect, by counsel for appellants, that it would be unreasonable to presume that Mrs. Smith executed the deed of 1875 willingly, and after having the same properly explained to her by the officer taking her acknowledgment, because the officer failed to certify that she declared that she had willingly executed said deed, and that she did not wish to retract her act in doing so, and because this certificate of the officer also failed to recite that she was examined in that connection privily and apart from her husband.

This contention is correct as an abstract proposition, when it comes to the question of the introduction in evidence of the deed of a married woman touching her separate property, acknowledged in the manner that this

deed was acknowledged, for the purpose of showing title out of such married woman, in virtue of said deed alone, but we think the facts disclosed by this record, without dispute, showing no character of claim whatever to this land or any portion of it by Mrs. Smith, or any one for her, or claiming under her for more than a quarter of a century after said deed to Humble was executed, during which time she continued to reside near the land, and observed, or must have known of, the active claim of title made thereto by Humble and those holding under him, and the acts of ownership exercised by Humble and those claiming under and through the deed to him, compel the presumption and conclusion, by any reasonable mind, that Mrs. Smith willingly and freely executed the deed to Humble in 1875, and received what she considered to be at that time adequate consideration for the land thereby conveyed, and that she was satisfied with the transaction in its entirety. Now, if we are correct in this, then we further conclude that it ought to be presumed that the act of Mrs. Smith on October 30, 1901, in executing and delivering to Sidney Westheimer the deed here sought to be canceled, was confirmatory of her act on the 15th day of April, 1875, by which she attempted, for a valuable consideration then received, to convey the land in controversy to Pleasant S. Humble, the predecessor in title of the appellees here, and we so conclude. But, whether or not we be correct in this conclusion, we are certain that we are correct in concluding that the facts and circumstances in this record relied upon and urged by appellants as being sufficient to have carried to the jury the issue of fraud or mistake in the execution of the deed to Westheimer, as claimed by them, were not legally sufficient to have compelled or warranted the submission of such issues to the jury. Kellum v. Smith, 18 Tex. 838; Tompkins v. Bennett, 3 Tex. 36; Walton v. Blackman (Tenn. Ch. App.) 36 S. W. 195.

We do not care to enter into a discussion of the many authorities in this state discussing the quantum of proof that should be made and required where it is sought, as here, to cancel and annul a solemn instrument like a deed, on the ground of fraud, but will content ourselves with the statement that the rule is well established in this state, by all the authorities, to the effect that fraud in such instances must be shown by strong and clear proof, and we would be justified in saying that many decisions may be found which hold that such proof must be, not only clear and strong, but satisfactory and convincing. The reason for this sound and just rule, as we think, may be clearly gathered from these words, which were written by that eminent jurist, Judge Royall T. Wheeler, in disposing of an issue of this character, in the case of Kellum v. Smith, 18 Tex. 836:

"There can be no more satisfactory ground for setting aside contracts, or vacating the most solemn acts and judgments of courts, than fraud, where it is established by proof; but there could be no more dangerous doctrine, than that which would recognize a right in juries to deduce the conclusion of fraud, without competent evidence. There would, indeed, be cause of alarm, if any man's title to his property were liable to be annulled upon evidence such as the record in this case discloses, as affecting the appellant. * * *"

[3, 4] It will be found, upon examination of the many authorities in this state, and, indeed, as we believe, in most of the states, that before a deed can be canceled and annulled on the ground of fraud facts and circumstances ought to be brought forth and presented, which would clearly lead a fair and reasonable mind to the conclusion that fraud was actually perpetrated, and that it should never be permitted a jury to reach such conclusion upon mere inferences and suspicions from mere circumstances, merely consistent with, but not clearly leading to, the conclusion that fraud was perpetrated, as claimed. We believe that the most that can be said of the facts and circumstances, which it is claimed by appellants show fraud or mistake in the execution of the deed to Westheimer under consideration, is that from such facts and circumstances, or some of them, a jury might suspicion that there was such fraud or mistake, as claimed; but, surely, there is not one substantial fact or circumstance in this record that could reasonably warrant the conclusion by a fair and reasonable mind that any such fraud was perpetrated, or mistake induced, as claimed by appellants; and, having reached this conclusion, it follows, of course, that we are of opinion that the trial court did not err in peremptorily instructing the jury to return a verdict in favor of appellees for the land in controversy. The first assignment of error is therefore overruled.

This ruling would dispose of the appeal in this case, and would render unnecessary a discussion or consideration of other assignments of error, were it not for the fact that appellants have also assigned error on the part of the trial court in excluding certain evidence offered by appellants in support of their contention of fraud or mistake.

By their fourth, fifth, sixth, and seventh assignments of error, appellants challenge the ruling of the trial court in sustaining objections interposed by appellees to certain statements that appellants claim were made by Sidney Westheimer to Mary Ann Smith on the occasion of Westheimer's going to her home for the purpose of procuring from her the deed here sought to be canceled, and also showing what the appearance of Mrs. Smith was with reference to nervousness and excitement during the interview between Westheimer and Mrs. Smith at her home at Smith's Point, which testimony was offered

by appellants for the purpose of establishing their allegations of fraud or mistake touching said deed.

These matters were offered to be shown by Arthur Smith and Mrs. Sadie Barr, one of whom was the son and the other the daughter of Mary Ann Smith, and both of whom were plaintiffs in this suit, and are claiming the land in controversy in right of their heirship to Mary Ann Smith. This proffered evidence was objected to for a number of reasons, the principal one of which was that these witnesses, Arthur Smith and Mrs. Barr, being parties to this suit, and claiming the land in controversy as heirs of Mary Ann Smith, and seeking to set aside and cancel the deed from their mother to Westheimer on the alleged ground of fraud or mistake in the execution of the same, could not testify as to any declarations of their mother, whether made at the time of the transaction between their mother and Westheimer or thereafter, and could not testify as to anything that occurred or was said by either party in the transaction between their mother and Westheimer, or as to any declarations of Mrs. Smith made at any time. The trial court sustained this objection, and appellants saved separate bills in this connection.

We will dispose of all of these assignments together, but there is some difference in them, and we will treat the fifth and seventh assignments first.

By the fifth assignment, it is pointed out, in substance, that when Westheimer first entered the home of Mary Ann Smith on the occasion of procuring the deed, and after introducing himself, then and there made to Mary Ann Smith, exclusive of any statement by her at that time, the following statements:

"That there was a formal defect in the acknowledgment to her supposed deed to P. S. Humble of 1875, and that he had taken the advice of a lawyer, and that the lawyer said he (Westheimer) could force her to correct the defect by suit in court, and could correct the same by suit, and put her to trouble and expense, and that he would bring suit and force her to correct the defect if she did not correct it without suit,"

—which statements plaintiffs offered to prove separately and collectively, and further in that connection offered to prove by each of said witnesses that such proffered introductory statements were independent of, and preliminary to, and preceding any offer or action or treaty or bargaining or agreement between them, Mary Ann Smith and Sidney Westheimer, for the quitclaim deed in question.

The seventh assignment shows the following: Appellants offered to prove by the plaintiffs, Arthur Smith and Mrs. Sadie Barr, that they were present at the time Westheimer and their mother spent about two hours together at their mother's home at Smith's Point, when Westheimer came for the deed in question, and that Westheimer, while

there, stated to their mother that the purported deed to Humble of 1875 had a formal defect in her acknowledgment, that a word in it was wrong, and that thereupon Westheimer assumed a threatening attitude towards their mother, and claimed to have superior knowledge and information about the matter, and further stated to their mother that he had consulted a lawyer before coming down to see her, and that the lawyer told him that he could go into court, if she refused, and force her to cure the defect, and that he would do so if she could not correct the defect without suit, and would put her to double expense; that their mother was unable to read without glasses, was without opportunity to consult counsel; that she then appeared to be alarmed, and said, "Well, she would sign it," and that when her daughter, Mrs. Barr, raised a question as to her signing it, she then stated that he said he would cure it by suit, and that a lawyer had told him so; that her mother stated that she believed what Westheimer said, and, besides, she was too poor to go into court and have the expense of a suit upon her; that it was then arranged for them to go to Galveston by boat, and Mrs. Smith to sign the deed; that the hardship of the trip was spoken of, and Westheimer then agreed to pay her $20 for going to Galveston to sign the deed, and agreed to pay Arthur Smith $5 for carrying them there, and that no consideration was paid or passed whatever for the quitclaim deed in evidence; that said deed was offered by plaintiffs against all defendants, or, if not admitted against all of them, against the defendants Brashear and his associates, as to certain portions of the land in controversy, and against each of them separately, on the ground that said Westheimer, in procuring said quitclaim, was acting as agent for these parties to the extent indicated.

The objection interposed by appellees to this proffered testimony has heretofore been stated, and the objection was sustained by the trial court.

[5] We have not the time to go into detail and discuss at length these assignments, but consider it sufficient to let the opinion show that the record discloses but one transaction and interview, which was a continuous one, between Westheimer and Mary Ann Smith from the time that Westheimer went to her home at Smith's Point, on the day in question, for the purpose of procuring from her the deed in question, and it is made reasonably clear, and, indeed, perfectly so, that whatever statement or statements, if any, were made by Westheimer to Mrs. Smith while in her home on the occasion in question, or whatever statement, if any, was made by Mrs. Smith on such occasion, had reference to and was connected with and arose out of and was part of the transaction between Westheimer and Mrs. Smith regarding the execution of the deed in question, and, under the statute

of this state, the same could not be proved or testified to by the witnesses by whom it was proposed to prove the same, they being heirs and claiming as such in this suit from Mary Ann Smith, and the court did not err in refusing this testimony. With reference to the statement included in these bills, that it was sought to prove, also, by these witnesses, that their mother had no eyeglasses at the time, and that she was very nervous, we might add that these matters were shown, without dispute, at other times, and these matters were before the court for what they were worth. Vernon's Sayles' Statutes, art. 3690; Holcomb v. Holcomb, 95 N. Y. 316; Howard v. Zimpelman (Sup.) 14 S. W. 59; Barrett v. Eastham Bros., 86 S. W. 1057; Stringfellow v. Montgomery, 57 Tex. 351; Am. & Eng. Ency. of Law (2d Ed.) p. 1025. Many authorities in this state and elsewhere could be cited which we think sustain the action of the trial court in this matter.

[6] The matters particularly pointed out by the fourth and sixth assignments, and which were sought to be shown by Arthur Smith and Mrs. Barr, were that during the time that Westheimer was in their mother's home at Smith's Point, and after the interview between her and Westheimer, and while their mother was being assisted in her preparations to go to Galveston, said witnesses, son and daughter, noticed that their mother seemed to be unusally excited and nervous and bothered. This was all objected to, as before indicated, on the part of appellees, on the main ground that it was an attempt to prove by these witnesses, who were suing as heirs of their mother, facts which amounted in law to statements by their mother, or transactions had in their presence between their mother and Westheimer, relative to the procurement and execution of the deed in question, and the court sustained these objections; and, while we do not pass upon the correctness of this particular ruling, we are inclined to believe that it is correct, but at the same time we are of opinion that if this particular testimony had been admitted and been before the court, and been considered by him in connection with any and all other facts in the record, the whole would not have been sufficient to have compelled or warranted the submission of this case to the jury. We therefore overrule the fourth, fifth, sixth, and seventh assignments of error.

The eighth assignment of error is overruled without comment, further than to say that in our opinion no prejudicial error, if error at all, is shown by such assignment.

[7] The ninth assignment of error is as follows:

"The court erred, and manifestly abused its discretion, after it had surprised the plaintiffs by declaring its opinion that the evidence was insufficient to take the case to the jury, in then refusing the plaintiffs, under the circumstances of their showing, to adduce in evidence the depositions on file herein of the defendant, Sidney Westheimer, duly taken and returned before the death of the former plaintiff, Mary A. Smith, whereby the circumstances of the transaction between him and said Mary A. Smith, when she gave to him the quitclaim deed of May 30, 1901, would have been sufficiently developed to send the same to the jury in any view, as shown by plaintiffs' bill of exception No. 10."

The bill of exceptions mentioned in the above assignment is very lengthy, indeed, and entirely too lengthy to be here set out, and we shall not attempt to go into the same at length, but think that a brief statement relative to the action of the trial court in declining to permit appellants to introduce the Westheimer depositions will suffice in disposing of this assignment.

The trial of this case was begun on January 3, 1916, and plaintiffs concluded the introduction of their evidence in chief on January 10th following, and rested, and thereupon defendants commenced the introduction of their evidence in chief, which was concluded on January 13th, and defendants then rested. No evidence whatever was introduced by defendants in that connection relative to anything that was said or done by Westheimer or Mrs. Smith relative to the procurement of the execution of the deed to Westheimer. Thereupon plaintiffs offered evidence in rebuttal of such evidence as defendants had offered on other issues in the case, to wit, those of innocent purchaser and limitation, without offering or tendering the depositions of Westheimer, and again rested, whereupon and at this stage of the trial defendants' counsel called plaintiffs' counsel before the court, and requested to know of plaintiffs' counsel if plaintiffs intended to offer in evidence the deposition of Sidney Westheimer. To this inquiry, in the presence of the court, plaintiffs' counsel stated to defendants' counsel and to the court that plaintiffs would not offer in evidence said deposition; and thereupon both sides announced that they had concluded their testimony, with the exception that defendants, executors of Herman estate, requested and were given the privilege, if desired, of later offering on the next day testimony of W. L. Barbee, with respect to matters testified about by the witness D. F. Rowe, called by the plaintiffs in rebuttal, which said testimony of said Barbee, if offered, would have reference only to a deed made by D. F. Rowe to Barbee, under power of attorney from Mary A. Smith, and would have no reference to any other issue in the case. This reserved privilege by defendants was not, however, in fact, exercised. After both sides had rested, as above stated, and under the circumstances mentioned, counsel for appellants argued the law of the case for approximately two days; and at the conclusion of such legal argument the court stated, in effect, that one phase of the case had not been argued by plaintiffs' counsel, and suggested that he would hear further argument on that point. The point that the court had in mind was as to the effect that

should be given to the fact that $500 was paid Mary A. Smith at the time the Humble deed was executed, and which, in the mind of the court, was shown to have been received by her, as bearing upon the consideration that she received for the quitclaim deed to Westheimer. This is substantially the point on which the court desired further argument, and in that connection the court stated that he would hear further argument from plaintiffs' counsel on the following morning on such point, if plaintiffs' counsel desired to further discuss the same. On the next morning, which was January 14th, and after plaintiffs' counsel had made an argument to the court on the point in question, the court declared that plaintiffs, as a matter of law, were not entitled to recover, stating his reasons therefor, which were as follows: (1) The evidence was insufficient to sustain a finding that Mary Ann Smith, at the time she executed the deed to Westheimer, did not know that the purported deed to P. S. Humble in 1875 did not deprive her of title to the lands in controversy, or that she was mistaken as to the legal effect of such instrument; but should the court be in error in this opinion, it would nevertheless be proper, in the opinion of the court, to peremptorily instruct the jury to return a verdict for defendants for the further reason that, even though Mrs. Smith were mistaken as to the legal effect of said proposed deed to Humble, the evidence in the case was insufficient to show plaintiffs to be entitled to the equitable relief sought..

The court, however, at the request of plaintiffs' counsel, reserved his final decision, and did not then instruct the jury to find for the defendants until plaintiffs' counsel could prepare and submit, on the afternoon of that day, the motion to withdraw their announcement that they were through with their evidence, and to be permitted to offer the deposition of Westheimer. Such motion, on the afternoon of the same day was presented to the court, and had attached to it a copy of the ex parte deposition of Westheimer. The testimony of Westheimer found in the deposition tendered, and which plaintiffs desired to offer, as above shown, was as follows:

"I claim to own land in the John Brown Jones one-third league, in Harris county, Tex. I claimed part of said one-third league on the 29th day of May, 1901. I bought said land from Andrew H. Dolin, all of the unsold portion of the John Brown Jones, and held it in fee simple title. I procured the quitclaim deed from Mrs. Mary Ann Smith, for the reason that the deed from Mrs. Mary Ann Smith to P. S. Humble, who bought the land from Mrs. Smith, was defectively acknowledged, and attempted to correct this error. I give her $25 for the quitclaim deed, as per agreement with her. I cannot say whether the correct date is inserted in the deed. I haven't the deed with me while testifying. My attorneys, Messrs. Brashear and Dannenbaum, advised me to procure the quitclaim deed. No; they did not tell me that 200 acres in the J. B. Jones as the Dunman home-stead belonged to Mrs. Smith. I knew that she was one of the heirs of said tract and that her interest was about one-tenth. I cannot say that they told me this. They did not tell me that the deed from Mary Ann Smith was absolutely void. They said the acknowledgment was defective, and advised the procuring of a quitclaim deed to cure this defect. As stated, I paid $25 for this quitclaim deed. I have stated, substantially, what my attorneys advised in answer to the preceding interrogatory. I acted upon their advice. It was some time afterwards that I so acted on their advice. I went in person to procure this quitclaim deed. Mrs. Smith was living at Smith's Point, on Galveston Bay. I went in a boat from Morgan's Point; a man in a boat took me over, whose name I don't know. I don't recollect what I said to him, except that I wanted to go to Smith's Point. I paid him $5 to take me there. He did not take me back. The deed was acknowledged before Mr. Cross. I don't know his initials. The deed will show his name. I cannot state the date of the deed; the deed itself will show. The deed was executed and acknowledged at the same time, before the above notary. She went from Smith's Point to Galveston in Mrs. Smith's or her son's boat. I paid them $5 for taking us over."

In response to interrogatory No. 5, he testified:

"Did you tell Mrs. Smith that the purported deed made to Humble was absolutely void? Did you tell her that she then owned, in addition to said 200 acres, an undivided interest in 577 acres?"

The answer of Mr. Westheimer in the deposition was:

"No; I told her the deed she executed was defectively acknowledged. I had her deed with me, and showed her the defect. No; I did not tell her the deed was void; I did not consider it void. I do not know whether I told her she owned a one-tenth interest in the 577-acre tract. Her deed to Humble covers this interest. I have answered above exactly what I stated to her in relation to the securing of the quitclaim deed. I did not read the deed to her. I had the notary read this deed to her; she read it while in the presence of the notary at Galveston. I do not know whether he knew her or not. He did not know me. He read the deed and explained it to her. The notary read the deed to her. I do not remember exactly what I told her when we went to have the deed acknowledged. We took the deed to Galveston, and went before the notary there. Only the members of her family were present, Mrs. Smith, a grown son, who ran the boat, and myself. I agreed to pay her $25 for the deed. We were to go to Wallisville. At her request we went to Galveston, as she wanted to do some shopping. I don't know how far it is from Smith's Point to Galveston."

We think that we have stated sufficient portions of the deposition of Westheimer to show the materiality, if any, of his evidence on the issues of fraud or mistake relative to the Westheimer deed. The first question with reference to this assignment is whether the trial court, under the facts and circumstances hereinbefore shown, abused its discretion in declining to permit appellants to withdraw their announcement of conclusion of evidence, and to re-open the case on the issue of fraud or mistake, by introducing the Westheimer deposition, as appellants prayed and sought to do, and, after full consideration of this matter, we are of the opinion

that we should not hold that the court abused its discretion in this matter.

This deposition of Westheimer had been on file in this case several years prior to the trial, and, presumably, counsel for appellants was thoroughly familiar with the contents of same, and knew the relevancy thereof on the issues of fraud or mistake, and was at perfect liberty to have introduced this deposition while making the case in chief for appellants, and had abundant opportunity to do so, and, in fact, the bill shows, as above stated, that counsel for appellants was interrogated, in the presence of the court, by counsel for appellees about this matter, and appellees' counsel desired to know whether such deposition of Westheimer would be introduced, and was expressly told by counsel for appellants that it would not be introduced. The trial of the case had already consumed many days, and we do not believe that we would be justified in holding that the trial court abused its discretion in refusing to again re-open the case and permit the introduction of this testimony. It will be observed that it is stated in the assignment raising this question that appellants' counsel were surprised at the ruling of the court upon the court's announcement that he would take the case from the jury, but there is nothing shown in this connection by appellants, relative to any statements or intimation by the trial judge which was calculated to surprise counsel for appellants, or to mislead counsel in any way, and as to why counsel should be surprised, and we do not clearly understand why the statement in this assignment, to the effect that the court erred in this connection "after having surprised" counsel for appellants, is made.

[8] It is true, this court has authority to review matters involving the exercise of discretion by the trial judge, but it is also a well-settled rule in this state that the appellate courts will not reverse causes on the ground that the trial court abused its discretion in some matter, unless it is made clearly to appear to the appellate court that such discretion was abused to the prejudice of the complaining party. Such abuse is not shown in this instance.

We do not mean to indicate, by anything that we have said in this connection, that if the testimony shown by the deposition of Westheimer had been before the court for consideration, there would have been sufficient evidence before the court to have carried the case to the jury.

What we have said, in effect, disposes of all assignments of error, and renders unnecessary a consideration of the issues of innocent purchaser and limitation interposed by the numerous defendants in this case, and believing as we do that no reversible error has been shown in the trial of this case, and that it was the plain duty of the court to peremptorily instruct a verdict in favor of the defendants, as it did, its judgment in doing so is in all things affirmed.